UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Micah Dozier, | ) | Civil Action No.  5:15-731-DCN-KDW |
| Plaintiff, | ) | |
| vs. | ) | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | ) | REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE |
| Defendant. | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.     Relevant Background

A.     Procedural History

On February 28, 2012,[1] Plaintiff filed an application for DIB under Title II of the Act, 42 U.S.C. §§ 401-433, alleging a disability onset date of August 8, 2011. Tr. 114-17. After being denied initially, Tr. 48-55, and on reconsideration, Tr. 56-65, on September 17, 2012, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 75-79. The ALJ conducted a hearing on September 16, 2013, taking testimony from Plaintiff and Vocational Expert ("VE") Carroll Crawford. Tr. 24-47. The ALJ issued an unfavorable decision on November 8, 2013. Tr. 7-19. On January 7, 2014, Plaintiff requested Appeals Council review of the decision, Tr. 6, but

---

[1] Although the application summaries are dated March 12, 2012, Plaintiff's protective filing date, as listed on the Disability Report – Field Office Form SSA-3367, is February 28, 2012. Tr. 128.

the Appeals Council declined, Tr. 1-3, making the ALJ's decision the Commissioner's final decision for purposes of judicial review. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on February 20, 2015.  ECF No. 1.

B.     Plaintiff's Background

Born in June 1963, Plaintiff was 48 years old as of his alleged onset date and 50 years old at the time of the ALJ's decision. Tr. 128. Plaintiff completed the twelfth grade and while in high school completed vocational training in building/construction. Tr. 132-33. Plaintiff worked from 1994 until 2011 as a hospital security officer. Tr. 133. Plaintiff seeks DIB due to a "back (lumbar) injury from a car accident." Tr. 132.

Medical records indicate that Plaintiff was seen on August 8, 2011, in the Lexington Medical Center Emergency Department following a minor motor vehicle accident. Tr. 177. Plaintiff symptoms were noted as "mild, achey (sic)" and notes indicated the accident "involve[d] restrained driver hit from behind, back and neck pain" with no radiating symptoms. *Id.* Results of spine x-rays and head CT indicated "No Acute Changes Obvious." Tr. 178. Plaintiff was discharged home with prescriptions for Vicodin and Voltaren DR,[2] and a note to be excused from work for two days, including the day of the accident. Tr. 179. In a follow-up examination by Dr. Smith on August 10, 2011, Plaintiff indicated worsening back pain and numbness in his lower extremities. Tr. 195. Dr. Smith ordered a repeat MRI, continued the prescriptions written in the emergency room, and excused Plaintiff from work for three days followed by two weeks of light duty. *Id.* On August 23, 2011, Dr. Smith reported the "MRI showed no acute changes." Tr. 196. Dr. Smith released Plaintiff to light duty work; however

---

[2]  Voltaren (diclofenac) is a nonsteroidal anti-inflammatory drug (NSAID). *See* https://www.drugs.com/voltaren.html (last visited Sept. 26, 2016).

Plaintiff stated there was no light duty work available. *Id.* Dr. Smith referred Plaintiff to a pain specialist. *Id.*

Plaintiff began seeing Dr. Ezra Riber of Palmetto Pain Management, LLC on September 26, 2011. Tr. 204. Dr. Riber assessed Plaintiff with post traumatic lumbar facet syndrome; chronic post traumatic low back pain; and right lumbar radicular component, improved. *Id.* He discussed facet injections and medial branch blocks with Plaintiff, mentioned radiofrequency rhizotomy,[3] prescribed him Valium 10 mg, issued a TENS unit,[4] and fitted Plaintiff for a lumbar support. Tr. 203. Plaintiff received an L4-5 and L5-S1 injection on October 25, 2011, and a bilateral L45 and L5-S1 medial branch block on November 23, 2011. Tr. 201-02. In a follow-up consultation on December 6, 2011, Plaintiff reported his pain relief between 40-50% following the procedure and indicated he was "still experiencing some mild discomfort in his low back, particularly with any activity." He rated his pain level at five on a zero-to-ten scale. Tr. 200. Plaintiff had another medial branch block in January 2012, Tr. 207, and continued with follow-up consultations throughout 2012, Tr. 205-09. On July 12, 2012, Plaintiff underwent a bilateral L4-5 and L5-S1 radiofrequency rhizotomy. Tr. 293. In a follow-up appointment on August 13, 2012, Plaintiff indicated that following the procedure he had 80% resolution of his symptoms for

---

[3] Radiofrequency (RF) rhizotomy or neurotomy is a therapeutic procedure designed to decrease and/or eliminate nerve pain symptoms that have not responded to more conservative pain treatments. The procedure involves destroying the nerves causing the pain with highly localized heat generated with radiofrequency. By destroying these nerves, pain signals are prevented from being transmitted from the spine to the brain. A successful procedure reduces pain without reducing nerve function. *See* https://www.mycdi.com/knowledge_center/pain_management/ radiofrequency_rf_rhizotomy_for_pain_relief/ (last visited Sept. 26, 2016).

[4] TENS stands for Transcutaneous Electrical Nerve Stimulation. TENS units are predominately used for nerve related pain conditions (acute and chronic conditions) and work by sending stimulating pulses across the surface of the skin and along the nerve strands. The stimulating pulses help prevent pain signals from reaching the brain. TENS units also help stimulate the body to produce higher levels of its own natural painkillers, called "endorphins." *See* http://www.tensunits.com/ (last visited Sept. 26, 2016).

two days, then his symptoms returned to baseline—seven on a zero-to-ten scale. Tr. 291. Plaintiff indicated his medications were working well and he had no side effects. *Id.* On November 29, 2012, Dr. Riber completed a questionnaire from Plaintiff's long term disability provider seeking information on Plaintiff's capabilities and medical condition. Tr. 257. Dr. Riber indicated his diagnosis of post traumatic lumbar facet syndrome but indicated Plaintiff's functional capabilities "only can be determined by FCE evaluation." Tr. 258. Plaintiff continued to be seen by Dr. Riber and Palmetto Pain Management through July 2013. Tr. 272-90.

 C. The Administrative Proceedings

  1. Plaintiff's Testimony

 A hearing was held on September 16, 2013, at which Plaintiff, represented by counsel, and Vocational Expert ("VE") Carroll Crawford testified. Tr. 24-47. Before beginning his examination of Plaintiff the ALJ clarified that Plaintiff had two accidents, "an earlier '04, '05 accident"[5] that "got exacerbated maybe by a 2011 accident." Tr. 27. The ALJ asked Plaintiff if he ever had a physical capacity evaluation, and Plaintiff responded that he did not. *Id.* The ALJ confirmed with Plaintiff that he was released to light duty in 2011 but there was no light duty work available. *Id.* The ALJ asked Plaintiff if his condition continued to get worse and Plaintiff responded in the affirmative. Tr. 27-28.

 Plaintiff confirmed that he has a high school education and has not worked since his alleged onset date of August 8, 2011. Tr. 28. Plaintiff stated that income he received in 2012 was from long-term disability and not from working. *Id.* Plaintiff testified that Dr. David Smith released him to light duty work, but he could not perform the type of light duty work that was

---

[5] Medical records from The Moore Orthopaedic Clinic indicate a December 2, 2004 date of injury. Tr. 218. Plaintiff was seen for consultation of his low back pain when he injured his back in an on-the-job motor vehicle accident. *Id.*

available because it required special knowledge, training, and licensing to run the control room. Tr. 28-29. In response to the ALJ, Plaintiff testified that he did not think he could have performed light work that required him to be on his feet up to six hours a day and lifting 10-to-20 pounds throughout the day. Tr. 29. Plaintiff stated that he did not think he could have done the work "[b]ecause at that time the pain was actually getting worse, that's why he released me." *Id.* Plaintiff stated that Dr. Smith referred him to Dr. Riber[6] for pain management related to his back injury. *Id.* Plaintiff testified that he had not had surgery on his back but did undergo physical therapy that helped "some." Tr. 30. Plaintiff testified that he also had six steroid injections in his back that helped at the time, but with each injection the efficacy period got shorter. *Id.* Plaintiff stated that his current treatment was "long-term medication for chronic back pain." Tr. 31. Plaintiff stated that he was taking Nucynta ER[7] 150 milligrams. *Id.* Plaintiff testified that he had previously tried using a patch but was no longer using it, but he was still using a TENS unit. Tr. 31-32. Plaintiff's attorney confirmed that this is "fundamentally a . . . back pain case . . . stemming from the three automobile accidents . . . ."[8] Tr. 32.

The ALJ asked Plaintiff to explain his pain and why it would prevent him from any reasonable work. Tr. 32. Plaintiff testified that the pain was "pretty much in [his] lower back around the lumbar area." *Id.* Plaintiff stated that the pain shoots down his left leg giving him a

---

[6] At the hearing Plaintiff indicated he thought the doctor's name was spelled Rieber, Tr. 29, and it is spelled that way throughout the transcript; however, medical records indicate the proper spelling is Riber, Tr. 204.

[7] NUCYNTA® ER (tapentadol) extended-release oral tablets are strong prescription pain medicine that contain an opioid (narcotic) used to manage pain severe enough to require daily around-the-clock, long-term treatment with an opioid, when other pain treatments such as non-opioid pain medicines or immediate-release opioid medicines do not treat pain well enough or the patient cannot tolerate them. *See* https://www.nucynta.com/patient/home (last visited Sept. 26, 2016).

[8] Although Counsel reported three accidents at the hearing, records indicate Plaintiff was involved in only two motor vehicle accidents. Tr. 177, 218; *see also* Representative Brief, dated

tingling sensation in his feet. *Id.* Plaintiff testified that the pain sometimes goes into his right leg but not at the same time. *Id.* Plaintiff testified he is unable to work because the "pain bothers [him] all the time." Tr. 33. When asked if he could work eight hours a day, 40 hours a week, in a job that was "a little light in terms of physical effort and something simple so you didn't have to concentrate just kind of easy repetitive stuff," Plaintiff responded in the negative. *Id.* Plaintiff testified he could not work because he was constantly on medication that would make him "sleepy among all other things, stomach bothering, and cottonmouth might call dry throat." Tr. 33-34. Plaintiff also noted "light-headed, dizziness" as side effects. Tr. 34.

Plaintiff testified that he lived with his wife and did nothing around the house because he had to take his medicine. Tr. 34. Plaintiff testified that when he gets up he eats the food his wife prepared for him before she leaves for work, after eating he takes his medicine, and after taking his medicine he sleeps. *Id.* Plaintiff testified that during the day he sleeps three-to-four hours at a time, and sleeps during the night. *Id.* Plaintiff stated that he takes bladder medication and his throat gets dry and his wife has to help him get up at night to go to the bathroom because the medication makes him dizzy. Tr. 34-35.

In response to questions from his counsel Plaintiff testified that he typically takes his medication in the morning between 10:00 and 12:00. Tr. 35. Plaintiff stated that he had been taking the Nucynta ER for at least a year and it was recently increased from 100 milligrams to 150 milligrams. Tr. 35-36. Plaintiff stated that he takes the medication twice daily as prescribed. Tr. 36. When asked about other activities he does around the home Plaintiff testified that he "might make some mashed potatoes sitting at the table every now and then." *Id.* Plaintiff stated that his wife does the yard work and housework but he does "all the eating." *Id.* Plaintiff's

---

Jan. 7, 2014, Tr. 167-69.

counsel noted that Plaintiff was standing and asked if it was common for him to have problems with his lower back and pain from sitting. *Id.* Plaintiff responded affirmatively and stated he could sit about 10-to-15 minutes before having problems. Tr. 37. Plaintiff described the pain he experienced as a "burning pain like it's severe in the lower back." *Id.* Plaintiff testified that he had not taken his medication the day of the hearing because he wanted to be "clear-headed" but would take them as soon as he got home. *Id.* Plaintiff's counsel then noted that Plaintiff resumed sitting and asked if that was normal. Plaintiff stated that was normal and that the pain "eases off sometime when I stand up, it eases off sometime when I sit down." *Id.* When asked if he had any problems walking, Plaintiff stated that it was "difficult to stay in balance" when he walked. *Id.* Plaintiff testified that he could walk for ten minutes before needing to stop. Tr. 38. Plaintiff stated that he had a treadmill at home and would try to test his ability to walk. *Id.* Plaintiff testified that his pain is primarily in his lower back but he experienced symptoms in his legs "every couple of days." *Id.* He stated that his legs felt "like they get numb and it send[s] a tingling sensation down to [his] feet." Tr. 38-39. Plaintiff stated that it helps to sit down and move his legs around or rub his legs with his hands. Tr. 39. Plaintiff indicated that Dr. Riber mentioned using a spinal cord stimulator but Plaintiff has not gotten one. *Id.* Plaintiff confirmed that he was wearing a lumbar brace that had been prescribed for him by Dr. Riber for at least a year. Tr. 39-40. Plaintiff stated that he wears the back brace up to eight hours a day and that it helped him but he was not able to sleep with the brace. Tr. 41. Plaintiff testified that the only doctor he was seeing was Dr. Riber and he visited him monthly for medication follow-up. Tr. 40. Plaintiff stated that the medication relieved the pain but that it put him to sleep and the pain returned within a half hour of waking. Tr. 41-42.

Plaintiff testified that he attended church but he would have to "keep getting up" during service. Tr. 40. Plaintiff stated he was not a member of any civic organizations. *Id.* Plaintiff testified that he had a driver's license and drove to the store to get his medication. Tr. 40-41. Plaintiff testified that he left his home on average less than five times a week and that his wife did most of the driving. Tr. 42. Plaintiff stated that his wife works full-time but she prepares his meals for the day. Tr. 42-43. Plaintiff testified that during the time he is awake he will try to read but he "[j]ust pretty much lay (sic) around" until his wife returns home from work and prepares dinner. Tr. 43.

2.    VE Testimony

VE Crawford characterized Plaintiff's past work as a security officer as light and semi-skilled, with a specific vocational preparation ("SVP") of three. Tr. 43. The VE stated that the skills were not transferable to sedentary. Tr. 44. The ALJ submitted three hypotheticals to the VE based on Plaintiff's current age of 50 years old. *Id.* The first, based on recommendations in Exhibit 3A,[9] included "a light exertional with no climbing of ladders, ropes, scaffolds; occasional climb of ramps and stairs; and then there's occasional balance, stoop, kneel, crouch, and crawl." Tr. 44. The ALJ asked if that would allow for past work and the VE responded that he "believe[d] the level of activity described both in the testimony and the DOT[10] would exceed occasional stair climbing and posturals." *Id.* The VE stated that other work at the light exertional level would include "handling type jobs" and provided the following examples: (1) stock checker, light, unskilled, SVP:2, DOT number 299.667-014, 1,600 jobs in South Carolina,

---

[9] Exhibit 3A is the Disability Determination Explanation for Plaintiff's DIB claim at the reconsideration level that includes a physical RFC assessment by State agency consultant Michael Beinor, MD dated August 14, 2012. Tr. 60-61.

[10] "DOT" is an abbreviation for the *Dictionary of Occupational Titles*, published by the United States Department of Labor; *see* 20 C.F.R. § 404.1566 (d)(1) (SSA will take administrative

142,000 jobs nationwide; and (2) nut and bolt assembler, light, unskilled, SVP:2, DOT number 929.587-010, 1800 jobs in South Carolina, 120,000 jobs nationwide. Tr. 44-45.

The ALJ's second hypothetical mirrored the first "except for the exertional level, which would be at sedentary." Tr. 45. The ALJ noted that Plaintiff's counsel pointed out in his brief "there would be a GRID rule at 50 but part of the AOD [alleged onset date] is not covered" so he asked the VE to respond regarding other work. *Id.* The VE provided the following examples: (1) bench hand worker, sedentary, unskilled, SVP:2, DOT number 715.684-026, 1,200 jobs in South Carolina, 84,000 jobs nationwide; and (2) surveillance monitor, sedentary, unskilled, SVP:2, DOT number 379.367-010, 1,230 jobs in South Carolina, 78,000 jobs nationwide. Tr. 45.

The ALJ's final hypothetical "was in response to the periods of time testified at for sleeping" which the ALJ couched as "sustainability hypothetical." Tr. 45. The ALJ noted "this hypothetical person, regardless of the underlying reason or reasons therefore and regardless of the exertional level, cannot sustain eight hours of work a day, day after day, 40 hours of work a week, week after week." *Id.* The ALJ asked if that would eliminate all work on a full-time competitive basis. The VE responded that it did and there would be no full-time work. *Id.*

Plaintiff's counsel confirmed with the VE that there were no transferable skills from Plaintiff's previous work. Tr. 46.

II.     Discussion

A.     The ALJ's Findings

In his November 8, 2013, decision, the ALJ made the following findings of fact and conclusions of law:

> 1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

---

notice of the contents of the DOT).

2.      The claimant has not engaged in substantial gainful activity since August 8, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: degenerative disc disease and chronic pain syndrome (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except no lifting and/or carrying over 20 pounds occasionally and 10 pounds frequently; no climbing of ladders, ropes or scaffolds; no more than occasional climbing of ramps and stairs; and no more than occasional balancing, stooping, kneeling, crouching, or crawling.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on June 22, 1963, and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 8, 2011, through the date of this decision (20 CFR. 404.1520(g)).

Tr. 12-18.

B.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability,"

defined as:

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations

promulgated under the Act have reduced the statutory definition of disability to a series of five

sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing

considerations and noting "need for efficiency" in considering disability claims).  An examiner

must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a

severe impairment; (3) whether that impairment meets or equals an impairment included in the

Listings;[11] (4) whether such impairment prevents claimant from performing past relevant work

("PRW"); and (5) whether the impairment prevents the claimant from performing specific jobs

that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These

---

[11] The Commissioner's regulations include an extensive list of impairments ("the Listings" or
"Listed impairments") the Agency considers disabling without the need to assess whether there
are any jobs a claimant could do. The Agency considers the listed impairments, found at 20
C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R.
§ 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the
listed impairments for at least one year, he will be found disabled without further assessment. 20
C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish
that his impairments match several specific criteria or be "at least equal in severity and duration
to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see
Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his

considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of

---

impairment is disabling at Step 3).

that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.  *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.      Analysis

Plaintiff argues that the ALJ: (1) erred in failing to consider his amended onset date that resulted in his being disabled under the Grid rule; (2) erred in failing to acknowledge the opinions of the impartial VE; and (3) erred in holding that Plaintiff's severe impairments or combination of impairments did not meet the standards for total disability. Pl's Br. 2, ECF No. 13.

1.     Consideration of Amended Onset Date and Use of the Grids

Plaintiff argues that at the September 16, 2013 hearing he amended his alleged onset date from August 8, 2011 to June 22, 2013, and "[d]espite the amendment to the onset date, the ALJ erroneously references the initial alleged onset date of August 8, 2011 throughout his opinion." Pl.'s Br. 2. Plaintiff asserts that because he was 50 years old on the amended onset date Grid Rule 201.14 would apply and he would be considered disabled. *Id.* at 2-3. The Commissioner contends the "ALJ properly recognized that Plaintiff's age category changed during the pendency of the case and accordingly applied the applicable and relevant Grid Rules for Plaintiff's age(s) and maximum residual functional capacity." Def.'s Br. 12, ECF No. 15. The Commissioner asserts Plaintiff misread the ALJ's opinion and misunderstands the Grid Rules. *Id.* In reply Plaintiff contends that because the ALJ recognized that Plaintiff changed age categories that recognition amounts to a concession by Defendant that Plaintiff amended his onset date. Pl.'s Reply 1, ECF No. 16. The undersigned disagrees.

"The starting point in determining the date of onset of disability is the individual's statement as to when disability began. This is found on the disability application and on the Form SSA-3368-F8/3820-F6 (Disability Report). A change in the alleged onset date may be provided in a Form SSA-5002 (Report of Contact), a letter, another document, or the claimant's testimony at a hearing." SSR 83-20, 1983 WL 31249 at *2. In his application for DIB Plaintiff alleged an onset date of August 8, 2011.[12] Tr. 116. In his Brief Plaintiff alleges, without citing to a specific location in the hearing transcript, that he amended his onset date at the administrative hearing. Pl.'s Br. 1-2. The undersigned has reviewed the September 16, 2013, hearing transcript and notes that nowhere in the transcript does counsel or Plaintiff raise the issue of amending Plaintiff's

---

[12] In his initial application Plaintiff asserted an onset date of August 6, 2011, Tr. 114, but in an

onset date. In fact, the ALJ noted the onset date when questioning Plaintiff and no one disputed the original date:

Q:    And we do have an alleged onset date in this particular case of the 8th of August year 2011. And my question, first question regarding that date is, have you worked since then?

A:    I have, I have not.

Tr. 28. Later, in formulating his second hypothetical to the VE, the ALJ noted that Plaintiff's counsel had pointed out in his brief that "there would be a GRID rule at [age] 50, but part of the AOD [alleged onset date] is not covered so I would have you respond with regard to other work, if any." Tr. 45. Plaintiff's counsel had the opportunity to question the VE and did not address the alleged onset date. Tr. 46. The undersigned recommends a finding that the ALJ did not err in failing to amend the alleged onset date of disability.

The Medical-Vocational Guidelines, also referred to as "the Grids," are guidelines, located at 20 C.F.R. Part 404, Subpart P, Appendix 2. *See Heckler v. Campbell*, 461 U.S. at 461. The Grids consist of three "Tables," each representing a different residual functional capacity ("RFC"), including sedentary (Table 1), light (Table 2), and medium work (Table 3). *Id.* Each table then accounts for other vocational factors, including age, education, and previous work experience. For each combination of factors, the Grids provide whether the claimant is "Disabled" or "Not disabled." *Id.* In considering a claimant's age, the Regulations establish particular age categories: (1) younger person (under age 50); (2) a person closely approaching advanced age (age 50-54); and (3) a person of advanced age (age 55 or older). 20 C.F.R. § 404.1563(c)-(e). As the ALJ noted in his decision, on his alleged onset date Plaintiff was 48 years old which is defined as a younger individual, but Plaintiff subsequently changed age category to "closely approaching advanced age." Tr. 17.

---

amendment to the application he changed the date to August 8, 2011, Tr. 116.

Once an ALJ determines a claimant's RFC, he may use the Grids to determine the claimant's level of disability and potential for employment. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). The ALJ found that based on the record Plaintiff had the RFC to perform light work with certain exertional limitations. Tr. 13. The ALJ noted that if Plaintiff had the RFC to perform the full range of light work "a finding of 'not disabled' would be directed by Medical-Vocational Rule 202.21 and Rule 202.14." Tr. 18. These rules are found in Table 2 of the Grids that determines disability for individuals limited to light work. 20 C.F.R. Pt. 404, Subpt. P, App. 2. Rule 202.21 refers to a younger individual who is at least a high school graduate with skilled or semi-skilled skills that are non-transferable and that Rule concludes that such an individual is not disabled. Rule 202.14 refers to an individual closely approaching advanced age who is at least a high school graduate with skilled or semi-skilled skills that are non-transferable and that Rule also concludes that such an individual is not disabled. *Id.*

If the ALJ were to mechanically apply the Grids—even if he used Plaintiff's alleged amended onset date—the Grids would direct a finding of not disabled based on Plaintiff's RFC for light work. Plaintiff erroneously relies on Table 1 of the Grids that determines disability for individuals limited to sedentary work. 20 C.F.R. Pt. 404, Subpt. P, App. 2. Under Rule 201.14 an individual closely approaching advanced age who is a high school graduate with skilled or semi-skilled skills that are not transferable would be deemed disabled. However, the ALJ determined Plaintiff had the RFC for light work; therefore, Table 2 is the appropriate table for consideration.

Because the ALJ found that Plaintiff's "ability to perform all or substantially all of the requirements of [light] level of work has been impeded by additional limitations" he made use of a VE to consider whether jobs existed in significant numbers in the national economy that Plaintiff could perform. Tr. 18. Given certain vocational factors the VE testified that Plaintiff

could perform the unskilled light jobs of stock checker and nut and bolt assembler and unskilled sedentary jobs of bench hand and surveillance monitor. *Id.* "[W]here an ALJ chooses to use a VE and propounds appropriate hypotheticals including all of the claimant's impairments and limitations to the VE, and where the VE's response is adequately supported by available information, the VE's opinion is substantial evidence upon which the ALJ's disability determination may rest. *Gray v. Colvin*, No. 5:14-CV-01172-JMC, 2015 WL 5782076, at *16 (D.S.C. Sept. 30, 2015) (internal citations omitted). Because the ALJ employed the services of a VE who performed an individualized analysis of the jobs that could be performed by Plaintiff, taking into consideration his age, experience, education and limitations, the undersigned recommends a finding that Plaintiff's argument that the ALJ erred in his application of the Grids is without merit.

### 2.    Opinions of the Impartial VE

Plaintiff asserts "the ALJ erroneously failed to mention or consider the full expert opinion in his order." Pl.'s Br. 3. Plaintiff contends that because the ALJ mentioned only two of the three hypotheticals posed to the VE in his decision it "had a prejudicial impact on the disposition of the Plaintiff's claim." *Id.* at 3-4. The ALJ's third hypothetical posed to the VE asked whether all work would be eliminated for a person who "cannot sustain eight hours of work a day, day after day, 40 hours of work a week, week after week." Tr. 45. The VE responded that there would be no full-time work for such an individual. *Id.* The Commissioner argues that the ALJ "properly considered the relevant VE testimony, and substantial evidence supports his finding that Plaintiff is able to perform work that exists in significant numbers in the national economy and, therefore, is not disabled." Def.'s Br. 14.

It is a claimant's burden to present evidence of his disability. 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); 20 C.F.R. § 404.1512(a) (generally setting forth a claimant's burden to produce evidence of a disabling impairment and the Agency's right to deny a claim for lack of evidence); *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). As discussed in the preceding section of this Report, at the administrative hearing the ALJ used a VE to opine on jobs Plaintiff could perform given his vocational profile. However, the ALJ was not obligated to accept or rely on all of the VE's responses.

> The RFC, and by extension, any hypothetical question relied upon, need only reflect those limitations that are credibly established by the record. *See Russell v. Barnhart,* 58 Fed. Appx. 25, 30 (4th Cir. Feb. 7, 2003) (citing *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987); *Youkers v. Colvin,* 2014 WL 906484, at *11 (S.D.W.Va. Mar. 7, 2014); *Rutherford v. Barnhart,* 399 F.3d 546, 554 (3d Cir. 2005) (holding that hypotheticals to VEs need not credit every symptom alleged by the claimant, only those that are "medically established"); *Jones v. Barnhart,* 364 F.3d 501, 506-07 (3d Cir. 2004) (holding that, while ALJs may pose multiple hypotheticals, they need only credit those that are consistent with the evidence of record). The ALJ is not required to adopt VE testimony in response to limitations that are not supported by the record. *Youkers,* 2014 WL 906484 at *11. *See also Parker v. Colvin,* 2013 WL 4748409 (W.D.N.C. Sept.4, 2013) ("[T]he fact that the Vocational Expert ("VE") responded to a hypothetical posed ... which was not consistent with the ALJ's RFC determination is of no consequence.").

*Baker v. Colvin*, No. 3:13-CV-20376, 2015 WL 5687544, at *9 (S.D.W. Va. Sept. 8, 2015), *report and recommendation adopted,* No. CV 3:13-20376, 2015 WL 5698511 (S.D.W. Va. Sept. 28, 2015).

In discussing Plaintiff's RFC the ALJ recounted Plaintiff's treatment history starting in 2005, Tr. 13, and noted that "[b]y April 22, 2013, the claimant demonstrated a normal gait; he demonstrated full range of motion of the lumbar spine; strength was 5/5 in the bilateral lower

extremities; examination of the spine was non-tender to palpitation; and he demonstrated no limp or foot drop. He was seen for regular follow up and medication refills on April 22, through July 17, 2013; and reported that he was doing well with his current medications (Exhibit 12F)." Tr. 15. The ALJ discussed Plaintiff's testimony regarding his allegations of pain and inability to work. Tr. 16. The ALJ determined the evidence did not support Plaintiff's "alleged inability to perform work activity" due to balance issues and medication side effects noting "there is no documented evidence contained in the treatment records that the claimant has ever reported complaints of medication side effects, including drowsiness, dizziness, sleepiness, lightheadedness, and nausea to any treating or examining physician or complaints of balance problems." Tr. 16. The ALJ also noted that "no current treating or examining physician has suggested specific functional limitations for [Plaintiff] except . . . prior to his alleged onset date." *Id.* In his decision, the ALJ properly weighed the medical evidence and specifically cited Plaintiff's limitations. The ALJ determined as follows:

> Based on review of the total evidence, I find the claimant has the residual functional capacity to perform work except no lifting and/or carrying over 20 pounds occasionally and 10 pounds frequently; no climbing of ladders, ropes or scaffolds; no more than occasional climbing of ramps and stairs; and no more than occasional balancing, stooping, kneeling, crouching, or crawling.

Tr. 17. The ALJ accounted for all of Plaintiff's credible limitations in his RFC assessment and found Plaintiff could not perform his PRW, but the VE identified jobs that a person with his vocational profile could perform. Tr. 17-18. *Mickles v. Shalala,* 29 F.3d 918, 929 n.7 (4th Cir. 1994) (concluding that the hypothetical presented to the VE need only include the impairments and limitations that the ALJ finds credible).

In *Tanner v. Commissioner of Social Security,* the Fourth Circuit Court of Appeals declined to uphold the plaintiff's argument "that the agency did not meet its burden of proof

regarding her ability to perform alternative work, because the vocational expert concluded that, given her functional limitations, there were no jobs that she could perform." 602 F. App'x 95, 101 (4th Cir. 2015) (per curiam). The court noted that the plaintiff's contention "overlooks the circumstance that the vocational expert only reached that conclusion upon questioning from her counsel, and that her counsel posed hypothetical questions that included severe functional limitations not supported by the medical evidence. Indeed, when the ALJ posed hypotheticals to the VE that set out all of [the claimant's] credible limitations, the VE responded that [the claimant] could perform the jobs of packer, assembler, marker pricer, sorter, and inspector." *Id.* Here, the ALJ determined that based on the record and the VE's testimony, Plaintiff was capable of performing other work that existed in significant numbers in the national economy. Accordingly, the undersigned recommends a finding that the ALJ's decision is supported by substantial evidence and that he did not err in declining to acknowledge the VE's response to the third hypothetical. *Craigie v. Bowen*, 835 F.2d 56, 57-58 (3d Cir. 1987) (holding that ALJ is not required to credit VE testimony elicited in response to hypothetical question that includes limitations that ALJ finds not to be credible).

### 3.     ALJ's Finding of Non-Disability

Plaintiff's final allegation is that the ALJ "erred in holding that Plaintiff's severe impairments or combination of impairments do not meet the standard for total disability." Pl.'s Br. 4. Plaintiff argues that his "medical symptoms present more than minimal effects on Plaintiff's residual functional capacity, and the ALJ's opinion stating otherwise is clear error that requires reconsideration of the record." *Id.* at 5. Plaintiff asserts the ALJ failed to adequately consider his testimony from the administrative hearing and the ALJ's "continued mentioning of [Plaintiff's] wife's full-time employment was irrelevant and prejudicial to the opinion of

Plaintiff's claim." *Id.* at 6. The Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff could perform a limited range of light work and "the ALJ accounted for all of Plaintiff's credibly established functional limitations in the RFC assessment." Def.'s Br. 17-18. The Commissioner also argues that substantial evidence supports the ALJ's evaluation of Plaintiff's subjective complaints. *Id.* at 19-20.

In evaluating a claim for DIB, the Commissioner is required to consider the combined effects of a claimant's impairments, and she must adequately explain her evaluation of the combined effects of those impairments. *See Walker v. Bowen*, 889 F.2d 47, 49-50 (4th Cir. 1989); *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985). These factors are mandated by Congress' requirement that the Commissioner consider the combined effect of an individual's impairments, 42 U.S.C. § 423 (d)(2)(c) (1982), and a general requirement by the courts that an ALJ explicitly indicate the weight given to all relevant evidence. *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987).

Here the ALJ determined at Step Two of the sequential evaluation process that Plaintiff has the severe impairments of degenerative disc disease and chronic pain syndrome, and a non-severe impairment of prostatitis. Tr. 12. At Step Three the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. *Id.* Plaintiff concedes that the "ALJ properly concluded that Plaintiff's degenerative disk disease and chronic pain syndrome are severe impairments" but argues his "hindering conditions, taken as a whole, show that Plaintiff lacks the [RFC] to perform the requirements of his [PRW] or any other work existing in significant numbers in the national economy." Pl.'s Br. 4. These "hindering conditions" cited by Plaintiff are his continued back pain and medical symptoms. *Id.* at 4-5.

An RFC "is the most [a claimant] can still do despite [his] limitations" and is determined by assessing all of the relevant evidence in the case record. 20 C.F.R. § 404.1545(a)(1). In assessing RFC, an ALJ should scrutinize "all of the relevant medical and other evidence" however, the claimant is "responsible for providing the evidence [the ALJ] will use to make a finding about [his] residual functional capacity." 20 C.F.R. § 404.1545(a)(3). The ALJ should consider any statements from medical sources about what the claimant can do, and observations about the claimant's limitations provided by the claimant or other persons. *Id.*  In his decision the ALJ stated that in making his RFC assessment he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . [and] also considered opinion evidence . . . ." Tr. 13. The ALJ's narrative discussion of the objective medical evidence included treatment notes, laboratory findings, and physician observations. Tr. 13-15. The ALJ assessed Plaintiff with the RFC to perform light work "except no lifting and/or carrying over 20 pounds occasionally and 10 pounds frequently; no climbing of ladders, ropes or scaffolds; no more than occasional climbing of ramps and stairs; and no more than occasional balancing, stooping, kneeling, crouching, or crawling." Tr. 13. The ALJ's narrative regarding Plaintiff's RFC is sufficiently detailed and explanatory to show that he considered the issue as to whether Plaintiff's impairments in combination were disabling. Significantly, the ALJ noted that on August 23, 2011, Dr. Smith released Plaintiff to return to light duty work, Tr. 14; from April 22 through July 17, 2013, Plaintiff was seen for regular follow-up and medication refills and reported he was doing well with his current medications, Tr. 15; and that no current treating or examining physician had suggested functional limitations beyond those discussed prior to Plaintiff's alleged onset date, Tr. 16.

SSR 96-7p requires that, prior to considering a plaintiff's subjective complaints, the ALJ must find there is an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Only then is the ALJ to move to the second step: consideration of the record as a whole, including both objective and subjective evidence, to assess the claimant's credibility regarding the severity of his subjective complaints, including pain.  *See* SSR 96-7p; *see also* 20 C.F.R. § 404.1529(b); *Craig v. Chater*, 76 F.3d 585, 591-96 (4th Cir. 1996). The requirement of considering a claimant's subjective complaints does not mean the ALJ must accept those complaints on their face. The ALJ should consider the claimant's credibility in light of his testimony and based on the record as a whole. This part of the ALJ's analysis requires him to weigh Plaintiff's complaints against "all the available evidence, including [Plaintiff's] medical history, medical signs, and laboratory findings," as well as "any objective medical evidence of pain" and "any other evidence related to the severity of the impairment, such as evidence of [Plaintiff's] daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it." *Craig,* 76 F.3d at 595 (internal citations omitted).

Here, the ALJ examined the record evidence concerning Plaintiff's claims and found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." Tr. 16. As set forth in the regulations, the ALJ considered Plaintiff's daily activities; the location, duration, frequency, and intensity of his symptoms; precipitating and aggravating factors; his use of pain medication or other treatments for subjective symptoms; and other factors related to functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §

404.1529(c)(3). The ALJ considered Plaintiff's subjective complaints, including those made to treating sources and those testified to at the administrative hearing. Tr. 13-16. Additionally, the ALJ considered Plaintiff's testimony as to his daily activities which included "driving, reading, attending church, and lying around." Tr. 16. The ALJ also noted Plaintiff's testimony that he is alone all day while his wife works full-time. *Id.* After consideration of the evidence the ALJ concluded the objective findings and treatment notes of Plaintiff's treating sources and the credible findings related to his subjective symptoms were consistent with the ALJ's RFC assessment. Tr. 17. Because the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence, and properly addresses Plaintiff's impairments, the undersigned recommends a finding that Plaintiff's argument that the ALJ erred in not finding him totally disabled is without merit.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that the Commissioner performed an adequate review of the whole record, and the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under Section 205(g), sentence four, and Section 1631(c)(3) of the Act, 42 U.S.C. Sections 405(g) and 1383(c)(3), it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

September 26, 2016                                  Kaymani D. West
Florence, South Carolina                           United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**